IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 11, 2015 Session

## STATE OF TENNESSEE v. MICHAEL ANTHONY LOGAN

**Appeal from the Criminal Court for Davidson County
No. 2008-A-821      Monte Watkins, Judge**

---

**No. M2013-02701-CCA-R3-CD – Filed July 27, 2015**

---

Aggrieved of his Davidson County Criminal Court jury convictions of attempted especially aggravated robbery, aggravated robbery, carjacking, reckless endangerment, and three counts of aggravated assault, the defendant appeals. He claims that (1) the trial court erred by denying his motion to dismiss based upon a violation of his right to a speedy trial; (2) the trial court denied his right to due process of law by failing to rule on his pretrial motions; (3) the evidence was insufficient to support his convictions of attempted especially aggravated robbery, aggravated robbery, and aggravated assault; (4) his conviction of reckless endangerment is void because that offense was not a lesser included offense of the charged offense of aggravated assault; (5) the dual convictions of aggravated robbery and carjacking violate principles of double jeopardy; (6) he was denied the constitutional right to confront the witnesses against him; (7) the trial court's failure to enforce its subpoenas denied him the right to compulsory process; (8) the trial court should have either excluded certain evidence or granted the defendant's motion for a continuance; (9) the trial court erred by denying his motion to suppress certain evidence; (10) the trial court erred by failing to exclude an out-of-court identification of the defendant; (11) the trial court erred by failing to order the production of certain evidence; and (12) the trial court erred by imposing consecutive sentences. Because felony reckless endangerment is not a lesser included offense of aggravated assault, the defendant's conviction of that offense is reversed, and that count is remanded for a new trial on the remaining lesser included offense of assault. We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Richard C. Strong (on appeal) and Sean McKinney, Nashville, Tennessee (elbow counsel at trial), and Michael Anthony Logan, pro se (at trial), for the appellant, Michael Anthony Logan.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General (Senior Counsel); Victor S. Johnson III, District Attorney General; and Roger Moore and Hugh Ammerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

A Davidson County Criminal Court jury convicted the defendant of attempted especially aggravated robbery, aggravated robbery, carjacking, three counts of aggravated assault, and reckless endangerment based upon evidence that he committed a series of violent offenses on July 22, 2006.

On July 22, 2006, 83-year-old Virginia Mary Gallagher went to the McDonald's restaurant on Nolensville Road as was her custom to order hash browns and coffee for her lunch. As was also her custom, Ms. Gallagher double-parked her BMW automobile near the dumpster so as to avoid the potential for damage caused by other cars. At some point after her arrival, the McDonald's maintenance man alerted store manager Jason Hendricks to a problem with Ms. Gallagher. Believing that some damage had been done to her car, Mr. Hendricks went outside to check on her. When he got outside, however, he saw "two sets of feet[] sticking out the driver's side door" of Ms. Gallagher's car and a man lying on top of Ms. Gallagher. Mr. Hendricks thought that Ms. Gallagher was being raped and immediately ran to her aid.

Ms. Gallagher called out, "Jason, help me," and, after the man, whom Mr. Hendricks identified as the defendant, got out of the car, she said, "Jason, he has my purse." Mr. Hendricks saw the purse in the man's hand, and he reached for it. The man then struck Mr. Hendricks "a couple of times with the knife" that the man had in his hand and "took off running." Mr. Hendricks gave chase. The defendant got into a black pickup truck, and Mr. Hendricks climbed into the bed of the truck, grabbed a "metal stake thing[] that was in the back of the truck" and shattered the back window of the truck. When the truck began to pull away, Mr. Hendricks jumped from the truck and ran back to check on Ms. Gallagher, whose shirt was covered in blood. Other testimony established that Ms. Gallagher suffered four superficial knife wounds that were treated during a 24-hour hospital stay.

After leaving the McDonald's, the defendant crashed his black pickup truck on Nolensville Road and then ran into the parking lot of the Aquatic Critter, where he

encountered the Goble family, who had just left the store and were in the process of entering their Dodge Caravan. The defendant approached Mr. Goble "frantically yelling, 'They're trying to kill me, they're after me,' or something to that effect." The defendant tried to take Mr. Goble's car keys, and Mr. Goble held them over his head until the defendant "come up with a knife and started, kind of, racking it across [Mr. Goble's] hands and wrists." Mr. Goble let the man have the keys. At that point, Mr. Goble's teenage grandson, Josh Goble, stepped in, and the man struck Josh Goble twice with the knife, leaving bruises but no lacerations. The defendant then got into the Goble's van and drove away while Ms. Goble stood at the open passenger's side door. The door struck Ms. Goble in the abdomen.

Lee Majors and Keith Brumley, who had observed the fracas at the McDonald's, followed the defendant's black pickup truck from the McDonald's. The men saw the defendant crash the truck and then run into the parking lot of the Aquatic Critter brandishing a large knife. The men watched the defendant's encounter with the Gobles, and then Mr. Majors, who was driving, positioned his own truck behind the Gobles' van in an attempt to prevent the defendant's leaving the scene. The defendant "slapped it in reverse and floored it, and managed to shove the truck out of the way, get enough room and get turned and take off south on Nolensville Road." Both men identified the defendant as the perpetrator.

Metropolitan Nashville Police Department ("Metro") officers discovered the defendant's driver's license and other identifying documents in the crashed pickup truck, which was registered to the defendant. Officers also discovered a tan purse inside the pickup truck, and deoxyribonucleic acid ["DNA"] testing established the presence of Ms. Gallagher's DNA on a lipstick inside the purse. The police were unable to recover the Gobles' van or locate the defendant until September 2006, when authorities from the Van Zandt County, Texas Sheriff's Office alerted them that the defendant had been apprehended in Texas and that the Gobles' van had been found.

Based upon this evidence, the jury convicted the defendant as described above, and, following a sentencing hearing, the trial court imposed a total effective sentence of 74 years' incarceration to be served consecutively to the life sentence imposed for the defendant's 1979 conviction of second degree murder.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. The trial court appointed counsel to represent the previously pro se defendant, and this appeal followed.

In this appeal, the defendant challenges the denial of his motion to dismiss the charges based upon a violation of his right to a speedy trial, the trial court's failure to

rule on various pretrial motions filed by the defendant, the sufficiency of the convicting evidence, the imposition of a conviction of reckless endangerment in count seven, the imposition of dual convictions for the aggravated robbery and carjacking of Mr. Goble, the denial of his right to confront the witnesses against him, the trial court's failure to enforce its subpoenas, the trial court's refusal to exclude DNA evidence or grant a continuance, the denial of his motion to suppress evidence seized from his truck, the trial court's failure to exclude Mr. Hendricks' out-of-court identification of the defendant, the trial court's failure to order production of the transcript of Detective Donaldson's testimony before the Tennessee Board of Probation and Parole, and the imposition of consecutive sentences. We consider each claim in turn.

## I. Speedy Trial

The defendant first asserts that the trial court erred by denying his motion to dismiss the charges against him because the State violated his constitutional right to a speedy trial. The State contends that the trial court properly denied the defendant's motion because the defendant was not deprived of his right to a speedy trial.

The right to a speedy trial, which is constitutionally and statutorily guaranteed, *see* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also* T.C.A. § 40-14-101, "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial.'" *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) (quoting *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997)). A reviewing court considers four factors when determining whether the right to a speedy trial has been compromised: (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right to speedy trial, and (4) any prejudice to the defendant occasioned by the delay. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973). Of these factors, the most important is prejudice, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." *State v. Vance*, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994). To activate the four-part inquiry, the interval between accusation and trial must have "crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992) (quoting *Barker*, 407 U.S. at 530-31). On appeal, the trial court's application of the four-part balancing test is reviewed for abuse of discretion. *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996).

Initially, we note that we can find no evidence in the record on appeal that the trial court ever issued a formal ruling on the defendant's motion either orally or in writing. That said, the fact that the trial court proceeded with the trial indicates that the court effectively denied the motion and implies that the court did not agree that the defendant's right to a speedy trial had been violated.

-4-

The facts regarding the defendant's detention prior to his trial are not entirely clear based upon the record before us, and we glean some of the facts from the Texas Court of Appeals opinion affirming the denial of the defendant's attempt to block his extradition. Warrants were issued for the defendant's arrest shortly after the offenses in this case, and Metro Detective Michael Donaldson added information concerning the warrants to the National Crime Information Center database. Approximately two months later, in September 2006, authorities with the Van Zandt County, Texas Sheriff's Office alerted Metro that they had the defendant in custody, and Metro authorities asked that the defendant be held pending his extradition to Tennessee. The defendant made a pro se demand for a speedy trial on May 31, 2007. The defendant was indicted on the charges in this case in March 2008. Some evidence adduced at the hearing on the defendant's motion to dismiss suggested that the defendant was being held in Texas pending the resolution of criminal charges in two different Texas counties and that an "exit detainer" was placed so that the defendant would be transferred as soon as his Texas charges were resolved.

Van Zandt County, Texas authorities dismissed charges against the defendant in December 2009 and transferred the defendant to Dallas County, Texas at that time to answer charges there. *See Ex Parte Logan*, No. 05-10-01354-CR, slip op. at 1, 2011 WL 989066, at *1 (Tex. App. Mar. 22, 2011). The Dallas County charges were eventually dismissed in August 2010. *See id.* Meanwhile, proceedings to extradite the defendant began in April 2010, and a governor's warrant issued on June 3, 2010. *See id.*, 2011 WL 989066, at *2. The defendant thereafter filed in Texas a petition for writ of habeas corpus seeking to block his extradition. The petition was denied, and the Texas Court of Appeals affirmed the denial of habeas corpus relief on March 22, 2011. *See id.*

Following his extradition to Tennessee in October 2011, the defendant elected to represent himself throughout his case, which representation included the filing of hundreds of pages of handwritten pleadings, many of which asked that the trial be continued.

The length of the delay between the defendant's arrest, which triggered his speedy trial right, and his July 2013 trial is significant enough to trigger further inquiry under *Barker*. Regarding the reason for the delay, we conclude that the State, based upon its failure to promptly begin the process of extradition, must bear some of the responsibility for the delay in bringing this case to trial. That said, however, the bulk of the responsibility for the delay must be attributed to the defendant. The resolution of the defendant's Texas charges encompassed more than three years of the delay, and the remainder can be attributed to the defendant's bid to halt his extradition and his own nearly obstreperous pretrial litigation. The defendant asserted his right to a speedy trial

in May 2007, before the indictment issued in this case but after arrest warrants were posted. Finally, we conclude that the defendant failed to show that he suffered any prejudice as a result of the delay in this case. Although the defendant suffered a lengthy period of incarceration prior to the trial, his incarceration was inevitable and not the result of the charges filed in this case. At the time he committed the offenses in this case, the defendant was on parole from a life sentence for a 1979 second degree murder conviction. Moreover, the defendant was held in Texas pending the resolution of unrelated charges. Additionally, although Ms. Gallagher was unavailable at trial, nothing suggests that her testimony would have been exculpatory to the defendant. Under these circumstances, the trial court did not err by effectively denying the defendant's motion to dismiss.

## II. Failure to Rule on Motions

The defendant next contends that the trial court violated principles of due process by failing to rule on several of his pretrial motions, including motions for expert assistance, a *subpoena duces tecum* for Ms. Gallagher's medical records, and to dismiss the indictment for the failure to preserve certain evidence. The State urges us to find the defendant's claim waived for failure to adequately cite to the record and for his failure to "properly address the trial court's failure to rule on these other motions." In the alternative, the State argues that the trial court's failure to rule on the motions was harmless because the motions lacked merit.

We decline the State's invitation to find the defendant's claim waived. The defendant's brief contains adequate citations to the record, and the record is replete with instances when the defendant asked the trial court to rule on his motions. Even throughout the trial, the defendant pointed out that the trial court had failed to address many of his pretrial motions.

That being said, the defendant has presented no authority for the proposition that the trial court's failure to issue a formal ruling on the defendant's motions, standing alone, amounted to a violation of principles of due process. The pro se defendant filed hundreds of pages of handwritten pleadings, among which were requests for the assistance of various experts to help him prepare his defense and motions to dismiss the indictment for a variety of reasons. He presented little or no evidence at any of the pretrial hearings to support any of his motions. The defendant argues that because he elected to proceed pro se, he was placed at a disadvantage. We note that the decision to proceed pro se was the defendant's own, entered into after the trial court granted his repeated requests to do so following a hearing to determine the defendant's ability to proceed pro se. The court warned the defendant that, because he was incarcerated and untrained in the law, choosing to proceed pro se was fraught with peril. The defendant

cannot now be heard to complain that he was disadvantaged by the trial court's giving him exactly what he wanted. Finally, although we agree with the defendant that the trial court should have ruled on his motions, we cannot say, based on the record before us, that the trial court's failure to do so resulted in any harm to the defendant's case. In consequence, the defendant is not entitled to relief on this issue.

### III. Sufficiency

The defendant asserts that the evidence was insufficient to support his convictions of the attempted especially aggravated robbery of Ms. Gallagher, the aggravated robbery of Gregory Goble, and the aggravated assaults of Joshua and Beverly Goble. The State submits that the evidence was sufficient to support each of the defendant's convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

### A. Attempted Especially Aggravated Robbery

The defendant contends that the evidence was insufficient to support his conviction of attempted especially aggravated robbery because the State failed to establish that Ms. Gallagher suffered serious bodily injury. The State asserts that because the defendant was convicted of the lesser included offense of attempted especially aggravated robbery, it was not required to prove that Ms. Gallagher suffered serious bodily injury.

-7-

"Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

The evidence adduced at trial established that Mr. Hendricks found the defendant lying on top of Ms. Gallagher inside her automobile. Mr. Hendricks saw the defendant in possession of both Ms. Gallagher's purse and a knife. Ms. Gallagher was stabbed four times. To be sure, serious bodily injury is an element of the offense of especially aggravated robbery, and proof of that element is necessary for a conviction of that offense. Because the jury convicted the defendant of the lesser included offense of attempted especially aggravated robbery, however, a showing of serious bodily injury was unnecessary. The evidence overwhelmingly established that the defendant used a deadly weapon, the knife, to take Ms. Gallagher's purse and that Ms. Gallagher suffered four stab wounds, facts that were more than sufficient to support a conviction of attempted especially aggravated robbery.

### B. Aggravated Assault and Aggravated Robbery

The defendant avers that the evidence was insufficient to support his convictions of the aggravated robbery of Gregory Goble and the aggravated assaults of Beverly Goble and Joshua Goble, claiming that the State failed to establish his identity as the perpetrator. He also claims that the evidence was insufficient to establish that he intentionally or knowingly placed Ms. Goble in fear of serious bodily injury or that he used a knife.

Aggravated assault, as charged in the indictment, is an intentional or knowing "assault as defined in § 39-13-101(a)(1)" that is committed via the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(B). Assault, as is relevant to this case, occurs when one "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

"Aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to

-8-

lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

Here, all three of the Gobles identified the defendant at trial as the man who attacked them in the parking lot of the Aquatic Critter. Additionally, Messrs. Majors and Brumley identified the defendant as the man who attacked the Gobles in the parking lot. Both the defendant and the Gobles' van were later discovered in Van Zandt County, Texas. This evidence clearly established the defendant's identity as the perpetrator of the attacks on the Gobles. Additionally, Ms. Goble's testimony established that she feared for her life as the defendant grappled with her husband for the keys to their van. She testified that the defendant wielded a knife during the attack and that she was still standing inside the open door of the van when the defendant got into the van and sped away. This evidence was sufficient to support the defendant's conviction of the aggravated assault of Ms. Goble.

## IV. Reckless Endangerment Conviction

The defendant contends that his conviction of felony reckless endangerment as a lesser included offense of the charged offense of the aggravated assault of Mr. Majors must be vacated because felony reckless endangerment is not a lesser included offense of aggravated assault as charged in this case. The State concedes that felony reckless endangerment is not a lesser included offense of aggravated assault and that the defendant's conviction of that offense should be reversed.

The parties are correct that felony reckless endangerment is not a lesser included offense of aggravated assault. *See State v. Cross*, 362 S.W.3d 512, 522 (Tenn. 2012) ("Reckless endangerment with a deadly weapon is not a lesser-included offense of aggravated assault committed by intentionally or knowingly causing another to reasonably fear imminent bodily injury by use or display of a deadly weapon."); *State v. Moore*, 77 S.W.3d 132, 136 (Tenn. 2002). Accordingly, the defendant's conviction of that offense must be reversed and the case remanded for a new trial on the remaining lesser included offense of assault. *See Cross*, 362 S.W.3d at 522 (vacating felony reckless endangerment conviction and remanding "for a new trial on any other lesser-included offense that has not already been rejected by the jury.").

## V. Double Jeopardy

The defendant next contends that his convictions of the aggravated robbery and carjacking of Mr. Goble violate principles of double jeopardy. The State avers that the convictions do not violate double jeopardy principles.

Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. Amend. V; Tenn. Const. art. 1, sec. 10. The state and federal provisions, which are quite similar in verbiage, have been given identical interpretations. *See State v. Waterhouse*, 8 Tenn. (1 Mart. & Yer.) 278, 284 (1827) ("[W]e did not feel ourselves warranted in giving [the double jeopardy provision of the state constitution] a construction different from that given to the constitution of the United States, by the tribunal possessing the power, (and of pre-eminent qualifications) to fix the construction of that instrument."). The United States Supreme Court has observed of the double jeopardy clause:

> Our cases have recognized that the Clause embodies two vitally important interests. The first is the 'deeply ingrained' principle that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' The second interest is the preservation of 'the finality of judgments.'

*Yeager v. United States*, 557 U.S. 110, 129 S. Ct. 2360, 2365-66 (2009) (citations omitted). To these ends, our state supreme court has observed that the Double Jeopardy Clause provides "three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

Whether multiple convictions violate double jeopardy principles is a mixed question of law and fact that we review de novo with no presumption of correctness. *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

The defendant's claim involves the third category of double jeopardy protection, multiple punishments for a single offense. "In single prosecutions, multiple punishment claims ordinarily fall into one of two categories, frequently referred to as 'unit-of-prosecution' and 'multiple description' claims." *Id.* at 543. Where, as is the case here, a defendant has been convicted of violating two different statutes, the claim is one of multiple description. "[W]here the same act or transaction constitutes a violation of

two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In *Watkins*, our supreme court "adopted the two-pronged *Blockburger* test for multiple description claims." *Smith*, 436 S.W.3d at 767 (citing *Watkins*, 362 S.W.3d at 556).

"[T]he threshold inquiry under *Blockburger* is whether the alleged statutory violations arise from 'the same act or transaction.'" *Watkins*, 362 S.W.3d at 545 (quoting *Blockburger*, 284 U.S. at 301-04).

> Where the threshold is met, meaning the convictions arose from the same act or transaction, a court next examines the statutes to determine whether the crimes of which the defendant was convicted constitute the same offense. Where each statutory offense includes an element not contained in the other, the offenses are distinct. Where the offenses are distinct under *Blockburger*, the legislature is presumed to have intended to allow the offenses to be punished separately.

*Watkins*, 362 S.W.3d at 545-46 (citations omitted).

Considering the threshold *Blockburger* inquiry, we conclude that the taking of the keys to the van from Mr. Goble was part of the same transaction as the taking of the van. Mr. Goble held the keys in his hand as he stood outside the van while loading the items he had purchased at the Aquatic Critter. The defendant came up to him wielding a knife and began trying to take the keys. The defendant was eventually successful in taking the keys, and he immediately got into the van and sped away. Clearly, the taking of the keys was part and parcel of the taking of the van. Because we have concluded that the taking of the keys and the taking of the van were part of the same transaction, we must next consider whether the crimes of carjacking and aggravated robbery, as charged in this case, constitute the same offense. To do this, we must determine whether "each statutory offense includes an element not contained in the other." *Watkins*, 362 S.W.3d at 545.

"'Carjacking' is the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; or (2) Force or intimidation." T.C.A. § 39-13-404(a). "Aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Robbery requires proof that

the taking was done with the intent to deprive the owner of the property, but carjacking contains no such requirement. *See State v. Wilson*, 211 S.W.3d 714, 721 (Tenn. 2007) (explaining that robbery includes all the elements of theft, including an intent to deprive the owner of the property while carjacking does not contain such a requirement). Additionally, robbery requires that the property be taken "from the person of another" while carjacking requires that the property be taken "from the possession of another." *See State v. Edmondson*, 231 S.W.3d 925, 929 (Tenn. 2007) (noting that the legislature "chose to use less limiting language" in the carjacking statute than that in the robbery statute). Carjacking requires the taking of a motor vehicle while robbery may occur with the taking of any property. Because each of the offenses contains an element that the other does not, we must presume that the legislature intended separate punishments for the takings that occurred in this case. *Watkins*, 362 S.W.3d at 545-46. *But see Edmondson*, 231 S.W.3d at 933 (concluding that Edmonson was guilty of carjacking when he "confronted [the victim], *knowingly obtained her keys by intimidation*, and drove off in her car") (emphasis added).

## *VI. Confrontation*

The defendant argues that the State's failure to call Ms. Gallagher as a witness at trial violated his constitutional right to confront the witnesses against him. The State asserts that the defendant is precluded from seeking relief on this claim because he failed to call Ms. Gallagher as a witness. In the alternative, the State avers that the State is not constitutionally required to present the testimony of the victim of the offense if the offense can be established by other evidence.

The State's assertion that the defendant did not attempt to call Ms. Gallagher as a witness is incorrect. There is at least some evidence in the record that the defendant attempted to subpoena Ms. Gallagher and that she was deemed unavailable due to her dementia.

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment

demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, ___ U.S. ___, 131 S. Ct. 1143, 1156 (2011).

The trial court admitted only two of Ms. Gallagher's statements, both of which were made to Mr. Hendricks during the attack at the McDonald's: "Jason, help me," and "Jason, he has my purse." Utilizing the primary purpose test, we easily conclude that neither of these statements was testimonial. Both were made during the ongoing emergency of the defendant's attack on Ms. Gallagher, and neither could be said to have been made to assist in a later criminal prosecution. In consequence, the admission of these statements did not violate the defendant's right to confront the witnesses against him.

With regard to the defendant's claim that Ms. Gallagher's absence from the trial, in and of itself, violated his rights under the Confrontation Clause, we note that the defendant has presented no authority to support his position. The Confrontation Clause is implicated only when the prosecution seeks to use the testimonial statement of a witness without making a showing that the witness is unavailable for trial and that the defendant has had an opportunity to cross-examine the witness. *See Crawford*, 541 U.S. at 68. The constitution does not require that the State present the victim of a crime as a witness if the elements of the offense can be proven beyond a reasonable doubt by other means, so long as those means do not run afoul of the rulings in *Crawford* and its progeny. "The Confrontation Clause categorically entitles a defendant *to be confronted with the witnesses against him*; and the primary-purpose test sorts out . . . *who is acting as a*

-13-

*witness and who is not.*" *Ohio v. Clark*, No. 13-1352, 2015 WL 2473372, at \*10 (U.S. June 18, 2015) (Scalia, J., concurring). When a person offers no evidence against a criminal defendant, the person is not "a witness against" the accused, and the person's status as a victim does not alter that fact. *See id.* ("*Crawford* sought to bring our application of the Confrontation Clause back to its original meaning, which was to exclude unconfronted statements made by *witnesses*—i.e., statements that were *testimonial.*").

## VII. Compulsory Process

The defendant asserts that the trial court's failure to enforce its subpoenas denied him the constitutional right to compulsory process. The State responds that the trial court was under no duty, save the issuance of the subpoenas, to compel the attendance of the potential witnesses identified by the defendant.

Both the state and federal constitutions guarantee a criminal accused the right to compulsory process for attaining the presence and participation of witnesses in his favor. *See* U.S. Const. Amend. VI; Tenn. Const. art. I, § 9.

> Because these rights are basic to our adversary system of criminal justice, they are part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States. The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice—through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence.

*Faretta v. California*, 422 U.S. 806, 818 (1975).

In constitutional law, as in all things in life, however, there are limits. "'[T]he constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.'" *State v. Smith*, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982) (quoting *Bacon v. State*, 385 S.W.2d 107, 109 (Tenn. 1964)); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (observing that, to establish a violation of the right to compulsory process, the defendant "must at least make some plausible showing of how the[] testimony would have been both material and favorable to his defense").

-14-

Following the conclusion of the State's case-in-chief, the defendant attempted to call Sherry Douglas as a witness. At that point, the court officer alerted the court and the parties that none of the witnesses subpoenaed by the defendant had appeared for trial. The court officer stated that he had "subpoenaed everyone that [the defendant] had on [his] list." The defendant named a few of those he wished to call, but the complete list of his desired witnesses does not appear anywhere in the record. Of the witnesses he named, the defendant mentioned with particularity Ms. Douglas, Chris Wright, Tony Azafar, and Gongal Hall, and he claimed that those witnesses were material because they had each examined a photographic array but failed to identify the defendant as the perpetrator. The court ruled that the witnesses' failure to identify the defendant did not make them material witnesses.

In our view, the defendant has failed to show that his right to compulsory process was violated. The defendant asked that the witnesses be subpoenaed, and the trial court ensured that the witnesses were subpoenaed. It is not clear that more was required under the circumstances presented here, particularly because the defendant made no showing that the testimony of the potential witnesses was material and admissible.

*VIII. Failure to Exclude DNA Evidence*

The defendant avers that the trial court should have excluded the results of DNA testing that were not disclosed until the week before trial or granted the defendant's motion for a continuance to review the DNA results. The State asserts that the trial court ruled appropriately.

The defendant claims, first, that the late disclosure of the results of DNA testing performed on several items violated the terms of Tennessee Rule of Criminal Procedure 16 and that, as such, the State should not have been permitted to utilize the results during its case-in-chief. Initially, we note that it is unclear from the record exactly what evidence the defendant seeks to challenge or when the defendant actually received the evidence in relation to the beginning of the trial. As best we can glean, however, the defendant is aggrieved regarding the results of DNA testing on a ball cap discovered inside his wrecked pickup truck.

Tennessee Rule of Criminal Procedure 16 requires, as is relevant here, the disclosure of "the results . . . of scientific tests or experiments if . . . the state intends to use the item in its case-in-chief at trial." Tenn. R. Crim. P. 16(a)(1)(G). The State conducted DNA testing on a number of items seized during the investigation in this case, including Ms. Gallagher's purse, which was discovered inside the defendant's wrecked pickup truck, a ball cap that was also discovered inside the pickup truck, and the contractor's bag and its contents that were discovered inside Ms. Gallagher's BMW. The

-15-

record establishes that the State received the results of testing performed on the ball cap on July 8, 2013, and that the State disclosed the results of this testing to the defendant as soon as the results became available. Rule 16 requires nothing more.

The defendant argues that the trial court should have granted him a continuance to seek expert assistance to understand the results of the DNA testing and to prepare for its use at trial. The trial court refused the defendant's request for a continuance, noting that nothing in the results could be seen as exculpatory and that the results of the testing did not form the basis of the State's case.

"[T]he granting or denying of a continuance is a matter which addresses itself to the sound discretion of the trial judge." *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 231 S.W.2d 707 (Tenn. 1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). "The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503 S.W.2d 226, 228 (Tenn. Crim. App. 1973)).

In our view, the trial court did not abuse its discretion by denying the defendant's motion to continue. Evidence that the ball cap discovered inside the truck that was registered to the defendant bore the defendant's DNA was neither exculpatory nor particularly probative of the defendant's guilt and, perhaps more importantly, was cumulative to other proof that the truck belonged to the defendant and that the defendant had committed the offenses at issue. Mr. Hendricks, Mr. Goble, Ms. Goble, Joshua Goble, Mr. Majors, and Mr. Brumley all identified the defendant as the perpetrator, and Messrs. Hendricks, Majors, and Brumley placed the defendant inside the black pickup truck. Additionally, the defendant's wallet, which contained his driver's license and other identifying information, was found inside the truck, along with the defendant's blood.

## IX. Suppression

The defendant next asserts that the trial court erred by refusing to suppress evidence seized from his black pickup truck, arguing that "the information contained in the affidavit in support of probable cause was obtained during an illegal search of his vehicle that occurred on the scene." Essentially, he claims that the officers illegally searched his truck at the scene of the crash and then used the information obtained during

that illegal search as the basis for getting a warrant to search the truck. The State avers that the trial court did not err by denying the defendant's motion because probable cause existed for the issuance of the warrant to search the defendant's truck aside from the evidence seized during the purported inventory search that was conducted at the scene.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7).

Although not raised by the parties, we address the issue of whether the seizure of items from the pickup amounted to a search or seizure for constitutional purposes.

The constitutional protections against unreasonable search and seizure "'are personal in nature, and they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.'" *State v. Cothran*, 115 S.W.3d 513, 520 (Tenn. Crim. App. 2003) (quoting *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001)). "One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched." *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982)); *see Katz v. United States*, 389 U.S. 347, 357 (1967); *see also State v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987) (stating that our state constitution affords no greater protection than the federal constitution and adopting the *Katz* standard). Thus, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and [if so] (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Ross*, 49 S.W.3d at 839). The second part of this inquiry focuses on

"whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances."  *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 357).

Because the Fourth Amendment protects people and privacy rather than places and property, a property interest does not determine standing to challenge a search and does not control the right of officials to search and seize. *See Oliver v. United States*, 466 U.S. 170, 183 (1984); *Katz*, 389 U.S. at 351, 353.  As the Supreme Court has recognized, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . .  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  *Katz*, 389 U.S. at 351.  Importantly, a "person can lose his reasonable expectation of privacy in his real property if he abandons it.  Thus, a person can, as he can with any other property, sufficiently manifest an intent to abandon his house." *United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012).  "Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item."  *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)).  Consequently, "abandonment," as understood in the constitutional context of unreasonable searches and seizures, "is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search." *United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir. 1981).

In this case, the defendant fled the McDonald's in his black pickup truck and then crashed the truck a short distance away.  The defendant jumped from the crashed truck and ran into the parking lot of the Aquatic Critter, where he stole the Gobles' van and fled the scene, ultimately traveling to Texas where he was later arrested. When officers arrived on the scene, the defendant's truck was partially obstructing the roadway.  By leaving his crashed vehicle in a position that was blocking the roadway and fleeing in another vehicle, the defendant manifested through his own actions an intent to abandon the truck and its contents.  As a result, the defendant maintained no reasonable expectation of privacy in the vehicle or the materials contained therein.  Consequently, no search occurred for constitutional purposes, and neither the seizure of evidence from the truck at the scene or thereafter violated the defendant's constitutional rights.

*X.  Mr. Hendricks' Out-Of-Court Identification*

The defendant argues that the trial court erred by refusing to exclude evidence regarding Mr. Hendricks' out-of-court identification of the defendant as the

perpetrator. We need not tarry long over the defendant's claim because it was the defendant who admitted this evidence at trial. At no point during the direct-examination of Mr. Hendricks did the State mention Mr. Hendricks' out-of-court identification. During his cross-examination of Mr. Hendricks, however, the defendant brought the issue before the jury and described in detail the circumstances surrounding the identification. The State only broached the subject during redirect-examination and only did so in a manner designed to clarify the circumstances of the identification. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## *XI. Detective Donaldson's Testimony to the Tennessee Board of Probation and Parole*

The defendant asserts that the trial court erred by refusing to require production of the transcript of Detective Donaldson's testimony before the Tennessee Board of Probation and Parole at the defendant's parole revocation hearing. The defendant failed to raise this issue in his motion for new trial and, in consequence, it is waived. Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Additionally, the defendant has failed to support this issue with any citations to the record, and his citation to *Jencks v. United States*, 353 U.S. 657 (1957), is inapt. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Under these circumstances, the defendant has waived our consideration of this issue.

## *XII. Sentencing*

In his final claim for relief, the defendant contends that the trial court erred by imposing partially consecutive sentencing in this case. The State asserts that consecutive sentencing was appropriate given the defendant's history of violent criminal offenses and the defendant's parole status at the time of the offenses.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be

imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

In this case, the trial court imposed partially consecutive sentences based upon its findings that the defendant had knowingly devoted himself to a life of crime, that the defendant committed the offenses while on parole, and that the defendant was a dangerous offender who had shown no hesitation about committing crimes where the risk to human life was high. *See* T.C.A. § 40-35-115(b)(1), (4). The court also found that consecutive sentencing was "necessary to protect the public against further criminal conduct by the defendant" and that "consecutive sentencing reasonably relates to the seriousness of the offenses committed." *See Pollard*, 432 S.W.3d at 863.

In our view, the record supports the sentencing decision of the trial court. The evidence adduced at the sentencing hearing established that the defendant committed his first murder at age 14, and then, in 1978, the defendant stabbed a woman to death. The defendant pleaded guilty in 1979 to second degree murder and received a life sentence. The defendant escaped from prison in 1983, and was convicted of robbery and felony escape in relation to that escape. He was paroled in January 2005, and he committed the offenses in this case on July 22, 2006.

*Conclusion*

Because felony reckless endangerment is not a lesser included offense of aggravated assault, the defendant's conviction of felony reckless endangerment in count seven must be reversed and that count remanded for a new trial on the remaining lesser included offense of assault. Finding no other error, we affirm the judgments of the trial court in all other respects.

_____

JAMES CURWOOD WITT, JR., JUDGE